# THE STATE *v.* LOWRY.

# LEWIS *v.* THE STATE.

[Nos. 20,719, 20,646. Filed April 26, 1906.]

1. COMMERCE. — *Interstate.* — *Subjects of.* — *Cigarettes.*—Cigarettes are a lawful subject of interstate commerce. p. 376.

2. SAME.—*Interstate.*—*Powers of Congress.*—Congress has the exclusive right to regulate interstate commerce. p. 378.

3. SAME.—*Interstate.*—*Police Power of States.*—The states may enact reasonable laws under the police powers in relation to interstate commerce where such laws are made local in character and affect such commerce only incidentally. p. 379.

4. SAME.—*Interstate.*—*Absence of Regulation by Congress.*—The absence of any regulation of interestate commerce by congress imports that such commerce should be free. p. 379.

5. SAME.—*Interstate.*—*State Legislation.*—*Police Power.*—*Conflict.*—Where the federal laws affecting interstate commerce are in conflict with state laws passed in the exercise of police power, the federal laws control. p. 379.

6. SAME.—*Interstate.*—*State Laws.*—*Police Power.*—*Questions Involved.*—A state law passed in the exercise of the state's police power is invalid, where such state law amounts to a regulation of, or discrimination against, interstate commerce. p. 380.

7. SAME.—*Interstate.*—*Implication of Power to Sell.*—The right to import an article which is a legitimate subject of interstate commerce imports the right to sell same in the original package. p. 380.

8. SAME.—*Interstate.*—*State Laws.*—Where the right to do a certain act in reference to an interstate shipment is an indispensable concomitant of the right to make such shipment, state legislation cannot curtail the right to do such act. p. 381.

State *v.* Lowry and Lewis *v.* State—166 Ind. 372.

9. COMMERCE.—*Interstate.*—*State Laws.*—*Regulating Use of Ship-ment.*—The right to import an article which is a legitimate subject of interstate commerce imports the right to make personal use of such article.  p. 381.

10. SAME.—*Interstate.*—*Federal Control.*—*Where Ends.*—Where an article is decided to be a legitimate subject of interstate commerce, federal control thereof does not end while the importer retains same in the original package.  p. 382.

11. SAME.—*Interstate.*—*State Laws.*—*Police Power.*—*Possession of Cigarettes.*—The possession of cigarettes in the original package, imported for personal use, cannot be made a criminal act by state law, while such cigarettes are a legitimate article of interstate commerce.  p. 383.

12. STATUTES. — *Construction.* — *Cigarettes.* — The act of 1905 (Acts 1905, p. 82), entitled "an act to regulate and in certain cases to prohibit the * * * keeping, * * * owning or giving away of cigarettes," etc., and providing among other things that it shall be unlawful for any person to "keep or own" any such cigarettes, does not apply to the act of smoking cigarettes or of having them in possession for the sole purpose of smoking.  Montgomery, J., dissenting.  p. 388.

13. SAME.—*Construction.*—*Cigarettes.*—*Contemporaneous Legislation.*—The statute (Acts 1905, p. 82) prohibiting the manufacture, sale, owning or keeping of cigarettes, which does not prohibit the smoking thereof in terms, will be held not to make smoking unlawful, especially where two separate statutes were passed (Acts 1905, pp. 440 and 719) by the same legislature within a few days, both of which, in terms, forbade the smoking of cigarettes.  p. 388.

14. WORDS AND PHRASES.—*"Regulate."*—To "regulate" a thing means to lay down a rule by which the thing shall be done.  p. 389.

15. STATUTES. — *Title.* — *Construction.*—*Cigarettes.*—An act to "regulate" and in some cases to "prohibit," the owning or keeping of cigarettes (Acts 1905, p. 82) imports that a regulation of the right to use cigarettes was intended rather than a complete prohibition, in which case the word "regulate" would be without meaning.  Montgomery, J., dissenting.  p. 389.

16. SAME.—*Construction.*—*Preference.*—*Rendering Act Constitutional.*—Where two interpretations of a statute are open, that is to be preferred which renders such act constitutional.  p. 390.

17. SAME.—*Construction.*—*"Keep."*—*"Own."*—The statute (Acts 1905, p. 82) making it unlawful for any person to "manufacture, sell, exchange, barter, dispose of, give away, or keep for

sale," whether by himself or by his "clerk, servant, employe or agent," or who shall "keep or own" or be "in any way concerned, engaged, or employed in owning or keeping" any cigarettes, does not make it unlawful for a person to have in his possession cigarettes for his personal use.    Montgomery, J., dissenting.    p. 390.

18.    STATUTES. — *Construction.*—*Words.*—*Noscitur a sociis.*—The courts will look to the context of a statute in order to interpret the meaning and intent of the words used.    p. 391.

19.    SAME.—*Construction.*—*Legislative History.*—In determining the scope and intent of an act the courts may look at the legislative history of such act as an aid.    p. 392.

20.    SAME.—*Criminal Law.*—*Construction.*—*Letter.*—*Spirit.*—The strict construction applicable to criminal laws requires that the alleged crime shall be plainly included not only within the letter, but within the spirit of, the statute.    p. 393.

21.    SAME. — *Criminal.* — *Construction.*—*Former Laws.*—In the construction of a criminal, as well as a civil, statute the courts will consider prior legislation on the same subject in determining the intent.    p. 394.

22.    SAME. — *In Derogation of Common Law.* — *Construction.* — Statutes in derogation of the common law are strictly construed, and, in cases of doubt, that construction is given which accords with the common law.    p. 394.

23.    SAME.—*Construction.*—*Public Policy.*—The courts in construing a statute will not give weight to its views on matters of public policy which, because of doubtful intent, might be read into such statute.    p. 396.

24.    SAME.—*Construction.*—*Canons of.*—*Violations.*—Where the construction of a statute contended for involves a violation of several canons of construction, such violations will be given a cumulative force in determining the intent of such statute. p. 397.

No. 20,719.    From Criminal Court of Marion County (34,819) ; *James M. Leathers,* Special Judge.    No. 20,646.    From Madison Circuit Court; *John F. McClure,* Judge.

Prosecutions by the State of Indiana against William H. Lowry and John M. Lewis.    From judgments acquitting Lowry and convicting Lewis, the State and Lewis, respectively, appeal.    *Not sustained.    Reversed.*

State *v.* Lowry and Lewis *v.* State—166 Ind. 372.

*Charles W. Miller,* Attorney-General, *C. C. Hadley, L. G. Rothschild* and *W. C. Geake,* for the State.

*Taylor, Woods & Willson,* for appellee Lowry.

*Leslie Kinnard, B. R. Call* and *Taylor, Woods & Willson,* for appellant Lewis.

GILLETT, C. J.—The defendants below, Lowry and Lewis, were respectively charged with violating an act of the General Assembly, approved February 28, 1905, known as the anti-cigarette law. Acts 1905, p. 82. Although the cases are wholly unrelated in their facts, the law questions involved are such that the appeals may advantageously be considered together.

In the first of said cases it appears that Lowry caused 1,000 cigarettes to be shipped to him, for his personal use, by a dealer in Louisville, Kentucky. The shipment was made by the Adams Express Company, a common carrier of goods for hire by express. The cigarettes were packed twenty in a box, each box had a United States revenue stamp thereon, and, in lots of twenty-five, these boxes were enclosed in packages or cartons, and the latter, in turn, were wrapped together in a strong paper and securely tied. This package was opened by Lowry upon its receipt, and from time to time, between May 8, 1906, and the institution of the prosecution, he smoked such cigarettes. It further appeared that Lowry, at the time in question, was forty years of age, in nowise engaged in the purchase, sale or distribution of cigarettes, and that the cigarettes he shipped into the State were not intended for sale, or to be given away, to any person or persons.

As to the prosecution against Lewis, it merely appears that at the time of his arrest he was smoking a cigarette, and that he had at that time upon his person a box containing five cigarettes. There is no contention that he was a dealer, that he had such cigarettes in his possession for the purpose of sale or gift, that he acquired them unlawfully, or that he was a minor. The case may therefore be as-

sumed to have been that of a man smoking a cigarette, and having in his possession a few cigarettes intended for his own consumption.

The title and body of the enactment under which said prosecutions were had (Acts 1905, p. 82) are as follows: "An act to regulate and in certain cases to prohibit the manufacture, sale, keeping, keeping for sale, owning, or giving away of cigarettes, cigarette paper, cigarette wrappers and other substitute for the same, providing penalties for the violation thereof, and repealing all laws in conflict therewith. Section 1. Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person, by himself, clerk, servant, employe or agent, directly or indirectly, upon any pretense or by any device, to manufacture, sell, exchange, barter, dispose of or give away, or keep for sale, any cigarettes, cigarette paper or cigarette wrappers, or any paper made or prepared for the purpose of being filled with tobacco for smoking; or keep or own, or be in any way concerned, engaged or employed in owning or keeping any such cigarettes, cigarette paper or wrappers, and any person for violation of the same shall be guilty of a misdemeanor, and upon conviction shall, for the first offense pay a fine of not less than $25 nor more than $50 and cost of prosecution, and stand committed to the county jail until such costs are paid; and for the second and each subsequent offense he shall pay, upon conviction thereof, a fine of not less than $100 nor more than $500 and the costs of prosecution, or be imprisoned in the county jail not to exceed six months: Provided, that the provisions hereof shall not apply to the sales of jobbers doing an interstate business with customers outside the State." §2216 Burns 1905.

Taking up the Lowry appeal first, the question arises whether a keeping or owning of cigarettes, in an unopened, original package (as that term is used in the law), is in violation of the statute. This question must be determined for two reasons: (1) Because the

lawfulness of Lowry's act up to that point is involved; (2) because a determination of that question in his favor would raise a presumption that the words "keep" and "own" were not used in the sense contended for by the Attorney-General. The question as to the lawfulness of interstate commerce in cigarettes was taken out of the pale of controversy by the decision in *Austin* v. *Tennessee* (1900), 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224. It was there said: "Whatever product has from time immemorial been recognized by custom or law as a fit subject for barter or sale, particularly if its manufacture has been made the subject of federal regulation and taxation, must, we think, be recognized as a legitimate article of commerce although it may to a certain extent be within the police power of the states. Of this class of cases is tobacco. From the first settlement of the colony of Virginia to the present day tobacco has been one of the most profitable and important products of agriculture and commerce, and while its effects may be injurious to some, its extensive use over practically the entire globe is a remarkable tribute to its popularity and value. We are clearly of opinion that it cannot be classed with diseased cattle or meats, decayed fruit, or other articles, the use of which is a menace to the health of the entire community. Congress, too, has recognized tobacco in its various forms as a legitimate article of commerce by requiring licenses to be taken for its manufacture and sale, imposing a revenue tax upon each package of cigarettes put upon the market, and by making express regulations for their manufacture and sale, their exportation and importation. Cigarettes are but one of the numerous manufactures of tobacco, and we cannot take judicial notice of the fact that it is more noxious in this form than in any other. Whatever might be our individual views as to its deleterious tendencies, we cannot hold that any article which congress recognizes in so many ways is not a legitimate article of commerce."

It was said in *Lyng* v. *Michigan* (1890), 135 U. S. 161, 166, 10 Sup. Ct. 725, 34 L. Ed. 150: "The power cannot be conceded to a state to exclude, directly or in-directly, the subjects of interstate commerce, or, by the imposition of burdens thereon, to regulate such commerce, without congressional permission. The same rule that applies to the sugar of Louisiana, the cotton of South Carolina, the wines of California, the hops of Washington, the tobacco of Maryland and Connecticut, or the products, natural or manufactured, of any state, applies to all commodities in which a right of traffic exists, recognized by the laws of congress, the decisions of courts and the usages of the commercial world. It devolves on congress to indicate such exceptions as in its judgment a wise discretion may demand under particular circumstances." It has been well said that commerce among the states is a unit, and in respect to that commerce this is one country, and we are one people.

Some of the statements of the court in *Leisy* v. *Hardin* (1890), 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128, wherein the right was recognized to ship intoxicating liquor into a prohibition state and to sell such liquor therein, in original packages, led to the enactment by congress of what is known as the Wilson act, wherein it is provided that all fermented, distilled or other intoxicating liquors transported into any state or territory, or remaining therein, for use, consumption, sale or storage, shall, upon arrival, be subject to the operation and effect of laws enacted by the state or territory in the exercise of its police powers to the same extent as if said liquors had been produced in such state or territory. 26 Stat., p. 313, c. 728. We refer to this enactment as explanatory of some of the cases which we shall hereafter consider.

The states are not prohibited from enacting reasonable laws, under the police powers, relative to interstate com-

merce, provided that such laws are local in their
character and only incidently affect such commerce,
but as the regulation of the transportation of goods
from one state into another is a matter which is national
in its character, the silence of congress is equivalent to a
declaration that such commerce shall be free.
*Brown* v. *Maryland* (1827), 12 Wheat. *419, 6
L. Ed. 678; *Leisy* v. *Hardin, supra; Western
Union Tel. Co.* v. *James* (1896), 162 U. S. 650, 16 Sup.
Ct. 934, 40 L. Ed. 1105. These two classes of powers—
the authority of the Nation over interstate commerce and
the control of the state over persons and things
within its borders—often clash, and in noway can
this commerce be kept free from burdensome re-
strictions except by the enforcement of the national au-
thority to the extent that is necessary to protect it. It
was said by Mr. Justice Catron, in *License Cases* (1847),
5 How. *504, *600, 12 L. Ed. 256, relative to the effect of
according to the states a power to regulate such commerce
while within their borders: "Upon this theory, the power
to regulate commerce, instead of being paramount over the
subject, would become subordinate to the state police
power; for it is obvious that the power to determine the
articles which may be the subjects of commerce, and thus
to circumscribe its scope and operation, is, in effect, the con-
trolling one. The police power would not only be a formid-
able rival, but, in a struggle, must necessarily triumph over
the commercial power, as the power to regulate is depend-
ent upon the power to fix and determine upon the subjects
to be regulated. The same process of legislation and rea-
soning adopted by the state and its courts could bring
within the police power any article of consumption that
a state might wish to exclude, whether it belonged to that
which was drank, or to food and clothing; and with nearly
equal claims to propriety, as malt liquors and the produce
of fruits other than grapes stand on no higher grounds

than the light wines of this and other countries, excluded, in effect, by the law as it now stands.· And it would be only another step to regulate real or supposed extravagance in food and clothing."

As has been frequently pointed out, that which does not belong to interstate commerce is within the jurisdiction of the police powers of the state, and that which does 6. belong to such commerce is within the jurisdiction of the United States. *Bowman* v. *Chicago, etc., R. Co.* (1888), 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; *Leisy* v. *Hardin, supra;* *Scott* v. *Donald* (1897), 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632. The courts cannot permit a conflict to continue between these powers. To the extent that the acts of a state legislature impinge upon national authority, they must go down. The question which is to be determined in each case is whether the state enactment amounts to a regulation of, or discrimination against, such commerce.

It is clear that the grant of national authority over interstate commerce would be in nowise satisfied by the holding that an original package was only exempt 7. from the authority of the state until it reached the hands of the consignee. .As far back as *Brown* v. *Maryland, supra,* in which the taxing power of the state and the right of importation from a foreign country were brought into conflict, Chief Justice Marshall observed: "There is no difference, in effect, between a power to prohibit the sale of an article, and the power to prohibit its introduction into the country; the one would be a necessary consequence of the other. No goods would be imported, if none could be sold. * * * The object of importation is sale. * * * It is inconceivable, that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value." These considerations were pro-

State *v.* Lowry and Lewis *v.* State—166 Ind. 372.

ductive of the holding in *Leisy* v. *Hardin, supra,* that there was a right to sell in original packages intoxicating liquors which had been shipped in from another state. In the case of *Bowman* v. *Chicago, etc., R. Co., supra,* which clearly foreshadowed the ruling in *Leisy* v. *Hardin, supra,* Mr. Justice Matthews, speaking for the court, said on page 499 : "The very purpose and motive of that branch of commerce which consists in transportation, is that other and consequent act of commerce which consists of the sale and exchange of the commodities transported."

Of course, national authority must end somewhere in the matter of interstate commerce, or the rights of the states to regulate their own domestic affairs would be entirely subordinated. But it is clear that when it is determined that an indispensable concomitant of the right of making interstate shipments under national protection or regulation is some further right which can alone make the privilege in any degree efficacious, it must indubitably follow, as within the principle of the above authorities, that such further right exists.

The declarations of law which have been made as to when the police power of the state attaches where the purpose of the importation is sale cannot with any degree of propriety be applied to cases where the purpose of the importation is not sale but personal consumption. It cannot be supposed that this great and growing class of commerce between the states was not regarded as a matter of national concern in the establishment of a Constitution which was adopted "in order to form a more perfect union." "Commerce, undoubtedly, is traffic," said Chief Justice Marshall, in the celebrated case of *Gibbons* v. *Ogden* (1824), 9 Wheat. 1, 189, 6 L. Ed. 23, "but it is something more—it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." See, also, *Lottery*

*Case* (1903), 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492. If commerce for consumption, carried on between states, is recognized as a matter of national importance, limitations cannot be placed about it by the police powers of the state which would render the right but a dry and technical one. As was said by Mr. Justice Field, in his concurring opinion in *Bowman* v. *Chicago, etc., R. Co., supra:* "To assert that, under the Constitution of the United States, the importation of an article of commerce cannot be prohibited by the states, and yet to hold that when imported its use and sale can be prohibited, is to declare that the right which the Constitution gives is a barren one, to be used only so far as the burden of transportation is concerned, and to be denied so far as any benefits from such transportation are sought. The framers of the Constitution never intended that a right given should not be fully enjoyed."

Commerce does not include everything which precedes or which follows after transportation, and we are not to be understood as intimating that in the matter of 10. goods shipped in for consumption the powers of the state can in nowise act upon them, where the effect is only incidental, secondary or remote. It is not necessary for us to determine in this case whether a person who has imported cigarettes in an original package for the purpose of consumption can successfully rely on the federal law as a protection against state control after he breaks bulk and thus commingles his goods with those of the state. The Supreme Court of the United States has never gone further in the matter of recognizing the right to retain possession of goods shipped into the state than to hold that there existed a right to sell the goods in an original package after it had reached its destination, and it may be that that court would regard the opportunity of evading state laws as too great to warrant the protection of an interstate shipment after it had lost its distinctive character as an original

package, but when the right of importation for consumption is recognized, notwithstanding hostile state laws, it must indubitably follow that the shipment will be protected down to the last moment that the goods continue in the hands of the importer in the original package.

There seems to be no case which presents itself precisely as this does, for the reason, doubtless, that legislation relative to such subjects has not, so far as we have observed, taken the form of a prohibition upon the use, but has, instead, been directed against the manufacture or sale of the article. We have found three cases, however, which, in principle, rule the question which is before us, namely, *Donald* v. *Scott* (1895), 76 Fed. 554, *Scott* v. *Donald* (1897), 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632, and *Vance* v. *W. A. Vandercook Co.* (1898), 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100. All of these cases arose in South Carolina, and they grew out of efforts to enforce what is known as the dispensary law, under which the state, for police purposes, took over the liquor traffic. The situation in those cases as respects legislation is somewhat different from that with which we have to deal, but nevertheless the cases are in point. In South Carolina the state was recognizing the consumption of intoxicating liquors as lawful, but, assuming to act under the authority of the Wilson law, had attempted to extend its powers over the importation of such liquors, while here, as respects cigarettes, the contention of the State is that even their use is under the ban, but at the same time the fact must be recognized that congress has not given its consent to the regulation of interstate traffic in cigarettes, so that the absence of congressional regulation must be regarded as equivalent to a declaration that commerce therein as between the states shall be free.

The opinions in *Donald* v. *Scott, supra,* and *Scott* v. *Donald, supra,* are based on the same case. The suit was instituted to restrain the seizure of intoxicating liquors under

the state law, while in the possession of a common carrier, the petitioner having imported such liquors for his personal use. It is true that they were in the possession of the carrier at the time, but the point in said opinions lies in the fact that importation for private use was protected. The circuit judge, in the course of his opinion, said: "The petitioner purchased this pacakage of liquor in North Carolina. He imported it into this state through a common carrier. He purchased and imported it solely for his own use and consumption. He is not, and never was, engaged in the liquor traffic. His well-known position as a leading editor in Columbia forbids such an idea. The package was plainly marked in his name, disclosed the fact of its purchase, importation, and personal use. Labels on the package, showing all these, could not have escaped observation. Under ordinary circumstances, he has established his right to the protection of the order of this court. The right to import under the interstate commerce law would be idle, indeed, if the subject-matter imported were not protected when it reached its destination. As it is protected in its importation solely because it is imported for personal use only, it will be protected so long as this personal use continues." On the appeal of said case to the circuit court of the United States, it was stated in argument by the attorney-general of the state that "the sole question is whether so much of the dispensary law of South Carolina as prohibits the importation of alcoholic liquors from other states for personal use was enacted in the legitimate exercise of the police powers of the state." The court affirmed the decree of the United States Circuit Court enjoining the seizure, and held that the sections of the statute which were involved were void, both as a hindrance to interstate commerce and as creating an unjust preference in favor of the products of the enacting state. After the decision of said case, the legislature of South Carolina repealed the sections of the law which had been condemned,

State *v.* Lowry and Lewis *v.* State—166 Ind. 372.

and substituted therefor requirements intended to pass muster as an inspection law. The statute, as thus amended, came under the review of the Supreme Court of the United States in *Vance* v. *W. A. Vandercook Co., supra,* the suit being by a California corporation, engaged in the production and sale of wines, to enjoin the seizure of original packages of wine which it had shipped into the state to fill orders which it had taken from private customers, and also to enjoin the seizure of packages which it was about to ship into the state to await sale. The court held that the requirements of the so-called inspection law were such that its provisions did not amount to a means reasonably suited to the end, and that petitioner was entitled to make said shipments for private consumption, but it upheld the provisions of the South Carolina law prohibiting the making of sales after the liquor had reached its destination. In the course of the opinion of the court this language was used on page 452: "The right of persons in one state to ship liquor into another state to a resident for his own use is derived from the Constitution of the United States, and does not rest on the grant of the state law." In a subsequent portion of the opinion the court said: "On the face of these regulations [referring to the provisions for inspection] it is clear that they subject the constitutional right of the nonresident to ship into the state and of the resident in the state to receive for his own use to conditions which are wholly incompatible with and repugnant to the existence of the right which the statute itself acknowledges." Certain members of the court dissented from the conclusion that the law was valid as to the original packages shipped into the state to await sale, and a statement made in the minority opinion, in referring to the proposition upon which the members of the court were united, gives point to the first of the above excerpts from the majority opinion. We refer to the statement that "the court concedes that it is not within the power of the state,

even when reënforced by the act of congress of August, 1890 [the Wilson act], to deprive a resident of one state of the right to ship liquor into another state to a resident for his own use, 'because such right is derived from the Constitution of the United States and does not rest on the grant of the state law.' " But we are not without further explanation on the part of the Federal Supreme Court as to the effect of this ruling in the case of *Vance* v. *W. A. Vandercook Co., supra.* The court made the following comments upon said case in *Pabst Brewing Co.* v. *Crenshaw* (1905), 198 U. S. 17, 25, 25 Sup. Ct. 552, 49 L. Ed. 925: "Considering the Wilson act and the previous decisions applying it, it was decided that the South Carolina law, in so far as it took charge in behalf of the state of the sale of liquor within the state and made such sale a source of revenue, was not an interference with interstate commerce. In so far, however, as the state law imposed burdens on the right to ship liquor from another state to a resident of South Carolina intended for his own use and not for sale within the state, the law was held to be repugnant to the Constitution, because the Wilson act, whilst it delegated to the state plenary power to regulate the sale of liquors in South Carolina shipped into the state from other states, did not recognize the right of a state to prevent an individual from ordering liquors from outside of the state of his residence for his own consumption and not for sale." In the dissenting opinion in *Pabst Brewing Co.* v. *Crenshaw, supra,* written by Mr. Justice Brown, and concurred in by three of the other justices, this explanation is given of the operation of the case of *Vance* v. *W. A. Vandercook Co., supra:* "The case turned upon the power of the consignee of liquors to receive them for his own use within the state of South Carolina, as well as the power to sell them in the original unbroken packages as imported to citizens of South Carolina. It was held in substance that the consignee had the constitutional right

State *v.* Lowry and Lewis *v.* State—166 Ind. 372.

to receive them for his own use without regard to the state laws, but that under the Wilson act he could no longer assert a right to sell them in original packages in defiance of the state laws." In *American Express Co.* v. *Iowa* (1905), 196 U. S. 133, 143, 25 Sup. Ct. 182, 49 L. Ed. 417, the court, after referring to certain of its decisions, used this language: "The doctrine of the foregoing cases was applied in *Vance* v. *W. A. Vandercook Co.* [1898], 170 U. S. 438, 442 [18 Sup. Ct. 674, 42 L. Ed. 1100], to the right of a citizen of South Carolina to order from another state, for his own use, merchandise, consisting of intoxicating liquors, to be delivered in the state of South Carolina. * * * Those cases rested upon the broad principle of the freedom of commerce between the states and of the right of a citizen of one state to freely contract to receive merchandise from another state, and of the equal right of the citizen of a state to contract to send merchandise into other states."

If the above cases mean anything and principle is to control, it must be held that it is incompetent for a state to deny to a proper person the right to hold in an original package an article like tobacco which he has shipped into the state. After he has borne the burden of importation, and has enjoyed the protection of the federal law from the initial negotiation until the package is at rest, it cannot be that the state can treat a possession thus acquired as contraband. So long as a right to import for personal consumption is recognized, we affirm with all confidence that the right to hold the package is protected. If it is not protected beyond that point, it is not because the commerce in the article is recognized by the United States as being in anywise unlawful, but only because the Federal Supreme Court may conclude that a protection of consumption, as distinguished from a protection of that which distinctively belongs to commerce, would too far disturb the autonomy of the states.

As before stated, this case does not require us to go further in the consideration of the federal law than to hold that the manner in which Lowry acquired possession of the cigarettes was not unlawful. Beyond that point we may affirm, as applied to both cases, that after a painstaking study of the statute in question the conviction has been forced upon us that said enactment does not apply to the act of smoking cigarettes or of having them in possession for the sole purpose of smoking.

Several reasons lead us to this conclusion: (1) If it had been the purpose of the legislature to prohibit smoking cigarettes, it can scarcely be supposed that the intention so to do would not have found direct expression. That being within the intent, the smoking of cigarettes would naturally have been the major denouncement. That this is a pertinent consideration is shown by the following statement of an English writer: "Sometimes, if the meaning of an enactment is not plain, light may be thrown upon it by observing that certain words, which we might reasonably expect to have been found in the enactment, have obviously been omitted from it by design." Hardcastle, Constr. and Effect of Stat. Law, 43. Within six days after the enactment of the statute in question, the legislature defined as a delinquent child any boy or girl (within certain age limits) "who smokes cigarettes." Acts 1905, p. 440, §1436k Burns 1905. In §§569 and 570 of an act concerning public offenses, which was adopted within ten days of the date of the enactment we are considering, the legislature mentioned no less than four times, in terms, the subject of smoking by children. Acts 1905, p. 719, §§2213, 2215 Burns 1905. In the light of these cognate enactments it seems incredible that the legislature should have indulged in so much of circumlocution to express a prohibition that, as the ultimate object, would naturally have had the first place in the act. Of course, we know that the smoking of

cigarettes, at least in some circumstances, was the evil with which the lawmaking power sought to deal, but as we have no means of knowing whether the end was to suppress the smoking of cigarettes entirely, or to limit their use, by making them difficult to obtain, particularly by boys, we are unable to say that the legislative purpose could only attain its consummation by a holding that the cigarette was intended to be contraband in all circumstances. Indeed, if we may judge by contemporaneous legislation, we may assume that because the cigarette was a recognized menace to the boys of the state, it was deemed advisable to take cigarettes out of commerce, by prohibiting the manufacture, sale, gift or other transfer of them.

(2) Another consideration which shows that the statute cannot have the broad construction which the State contends for is that the title of the act states that it is "an act to regulate and in certain cases to prohibit," etc. Now the primary meaning of the word "regulate" is "to lay down the rule by which a thing shall be done." Anderson's Law Dict. This must be the meaning of the statute in question, for the word is used, as the title shows, in contradistinction to the word "prohibit." We find in the act a limitation in favor of jobbers, in certain cases, but the statute will be searched in vain for anything which amounts to a regulation if the act is construed in accordance with the contention of the State. More might be said upon this subject, but the proposition is virile enough to maintain itself. We may, however, call attention to the fact that the conspicuous difference between the act in question and the Iowa anti-cigarette law (Laws of Iowa, 1896, p. 96) lies in the fact that the title of the Iowa act solely purports to be an act to prohibit.

(3) As shown by the opinion relative to the defendant Lowry, the act would be unconstitutional in part, if it were

held to apply to his act of shipping cigarettes into the State for his own use. Even in a case where the only question involved is as to the effect of an enactment, a construction is to be preferred, where it is reasonable, which will prevent the act from being unconstitutional in any circumstances.

(4) The only words in the statute which would be broad enough to cover the cases in hand are "keep" and "own," and yet we find that they are preceded by the words "manufacture, sell, exchange, barter, dispose of, give away, or keep for sale." As to the last-mentioned words, it will be perceived by what precedes them that the prohibition is not alone directed against what a person by himself may do, but that he is also subjected to the penalty for doing the same acts by his "clerk, servant, employe or agent," thus in a degree indicating that the prohibited acts may be done for him by others. Besides, the words "keep or own" have immediately following them a prohibition against being "in any way concerned, engaged or employed in owning or keeping any such cigarettes;" thus suggesting that this keeping or owning which is prohibited perhaps applies to a kind of keeping or owning in which others may be in some way concerned. Even the word "keep" is said to be derived from the Anglo-Saxon word cépan, another form of cypan, meaning to traffic, sell, store up, and the like. Encyclopaedic Dict. One of the meanings of the word "keep," according to the Century Dictionary, is "to have habitually in stock or for sale." It is also to be noted that it is the keeping or owning of "cigarettes," the plural number, which is prohibited, a fact that has a degree of significance in view of what precedes. Moreover, it would be but little short of ridiculous to say that a person smoking a cigarette kept or owned it, and even the possession by a smoker of a quantity of cigarettes, designed for mediate or immediate consumption, would, in ordinary parlance, be more likely

State *v*. Lowry and Lewis *v*. State—166 Ind. 372.

to be characterized as a having of them in his possession than as an owning or keeping of them. The latter words have in them more of the idea of permanency. This has been recognized by the courts as to the word "keep." *Easley* v. *Pegg* (1900), 63 S. C. 98, 41 S. E. 18; *Williams* v. *Fireman's Fund Ins. Co.* (1874), 54 N. Y. 569, 13 Am. Rep. 620; *Mears* v. *Humboldt Ins. Co.* (1879), 92 Pa. St. 15, 37 Am. Rep. 647; *First Congregational Church* v. *Holyoke Fire Ins. Co.* (1893), 158 Mass. 475, 33 N. E. 572, 19 L. R. A. 587, 35 Am. St. 508. As to the word "own," the Century Dictionary, in referring to the synonyms of "possess," states: "Have is the most general of these words; it may apply to a temporary or to a permanent possession of a thing. * * * To own is to have a good legal title to." It thus appears that neither of the words upon which the State relies are so distinct as not to be open to construction. This fact and the other considerations to which we have referred, both within and without the words of the enactment, make it clear either that the meaning of the words "keep" and "own" may be said from their intrinsic meaning not to cover such a case as this, or, at least, that when read in connection with what precedes and follows they are insufficient to bring the cases within the statute.

While it is proper to consider the force of particular words in determining whether a statute stands in need of construction, yet it is to be remembered that, that conclusion arrived at, the method changes, and the intent should be sought by a consideration of the entire enactment. As stated by Dwarris: "The framers of laws do not weigh only the force of single words, as philologists and critics, but of whole clauses and designated objects." Potter's Dwarris, Statutes, 196. It is by accommodating our mental vision to this evident truth that we avoid a wooden interpretation of the words and become able to apprehend the spirit of the statute. "It is

not the words of the law," says the ancient Plowden, "but the internal sense of it, that makes the law; the letter of the law is the body; the sense and reason of the law is the soul." *Eyston* v. *Studd* (1574), 2 Plow. 459. One of the maxims of the law which there is frequent occasion to employ in the construction of statutes is that of *noscitur a sociis*. It is known from its associates or associations. As stated by Maxwell: "When two or more words, susceptible of analogous meaning, are coupled together, *noscuntur a sociis,* they are understood to be used in their cognate sense. They take, as it were, their color from each other; that is, the more general is restricted to a sense analogous to the less general." Maxwell, Interp. of Stat. (3d ed.), 461. Another writer says: "Not only are words and provisions modified to harmonize with the leading and controlling purpose or intention of an act, but also by comparison of one subordinate part with another; that is to say, the sense of particular words or phrases may be greatly influenced by the context, or their association with other words and clauses. The principle is embodied in the maxim, *noscitur a sociis,* and is applicable to the construction of all written instruments." 2 Lewis's Sutherland, Stat. Constr. (2d ed.), §414. In the discussion of the maxim *noscitur a sociis,* Mr. Broom states: "It is a rule laid down by Lord Bacon, that *copulatio verborum indicat acceptationem ineodem sensu*—the coupling of words together shows that they are to be understood in the same sense." Broom's Legal Maxims (8th ed.), 588.

(5) The act in question passed the senate, where it originated, under the title, "An act to regulate the *manufacture, sale* and *giving away* of cigarettes, cigarette paper and other substitutes for the same, and repealing laws in conflict." (Our italics.) When the bill passed the house on third reading it retained said title, but the title was afterwards amended in said body by adding a penalty clause. This carried the bill back to the senate;

that body refused to concur in the amendment, and, as a result, a conference committee was appointed, which reported in favor of the adoption of the present title, and the recommendation was concurred in by both houses. A legislative history of this kind is too significant to be overlooked. As pointed out in *United States* v. *Trans-Missouri, etc., Assn.* (1897), 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, the attempt to determine the legislative purpose from the speeches of individual members of the assembly is open to the objection that each speaks for himself, but here we have both houses approving a title which states that the act relates to the "manufacture, sale and giving away of cigarettes and cigarette paper." The change which was subsequently proposed by the conference committee can readily be understood when it is considered that the act was really prohibitory in most particulars, and that it was only an act to regulate in the sense that it was designed to keep the traffic in leash. It is true that a motion failed in the house to amend the act so as to declare that nothing therein should apply to adults having cigarettes or cigarette papers in their possession. It can only be assumed, however, bearing in mind the nature of the title which was adopted by the house after said motion had been acted on, that the amendment was regarded as unnecessary.

(6) The fact must be remembered that the statute we are called on to construe is a criminal statute, and that the rule applicable to such statutes is that of strict construction; that is, the case must be within the spirit, as well as within the letter, of the statute. This rule, said Chief Justice Marshall, in *United States* v. *Wiltberger* (1820), 5 Wheat. *76, *95, 5 L. Ed. 37, "is founded on the tenderness of the law for the rights of individuals; and on the plain principle, that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is

to define a crime, and ordain its punishment." Mr. End-
lich states that the rule of strict construction "requires that
the language shall be so construed that no cases shall be
held to fall within it which do not fall both within the
reasonable meaning of its terms and within the spirit and
scope of the enactment. To determine that a case is within
the intention of a statute, its language must authorize the
court to say so; but it is not admissible to carry the prin-
ciple that a case which is within the mischief of a statute
is within its provisions, so far as to punish a crime not
specified in the statute, because it is of equal atrocity or
of a kindred character with those which are enumerated.
In this characteristic, the difference between liberal and
strict constructions is clearly presented. Whilst the letter
of a remedial statute may be extended to cases
clearly within the same reason and within the mis-
chief the act was designed to cure, unless such con-
struction does violence to the language, a consideration of
the old law, the mischief and the remedy, though proper
in the construction of criminal as well as other statutes,
is not in itself enough to bring a case within the operation
of the former class of statutes; their language, properly
given its full meaning, must, at least by that meaning,
expressly include the case; and in ascertaining that mean-
ing the court cannot go beyond the plain meaning of the
words and phraseology employed in search of an intention
not certainly implied in them." Endlich, Interp. of
Stat., §329.

(7) Another fact to be considered is that the statute,
which, as a penal enactment, cannot receive an equitable
construction, is subject to be limited, so far as the
meaning of its words are in doubt, by the fact that
it is in derogation of the common law. "The gen-
eral rule in exposition of all acts of parliament is this,
that in all doubtful matters, and where the expression is
in general terms, they [the words] are to receive such a

construction as may be agreeable to the rules of the common law, in cases of that nature; for statutes are not presumed to make any alteration in the common law, further or otherwise than the act does expressly declare." *Arthur v. Bokenham* (1708), 11 Mod. 147, 150.

There can be no doubt that the legislation in question proceeded from the postulate that an evil had grown out of the readiness with which cigarettes could be procured, but, looking at the words relied on, colored as they are by that which is specific, we are unwilling to conclude that it was the intention of the General Assembly to invade the private life of the adult further than to the extent that he must necessarily be subject to those requirements of the statute which do not admit of doubt. We quote, as considerably in point, the following language from *Church of Holy Trinity* v. *United States* (1892), 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226: "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. * * * For frequently words of general meaning are used in a statute, words broad enough to include the act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. * * * It is a case where there was presented a definite evil, in view of which the legislature used general terms with the purpose of reaching all phases of that evil; and thereafter, unexpectedly, it is developed that the general language thus employed is broad enough to reach cases and acts which the whole history and life of the country affirm could not have been intentionally legislated against. It is the duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, the act,

although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute." Here, however, it must always be borne in mind that the case is really not within the letter. It would be impossible to find a reason for the holding that the defendants were guilty of violating the statute, except as the enactment were approached in the spirit of wringing everything out of it which its words did not necessarily withhold.

We may assume that the General Assembly did not intend to put upon the statute books an act which would in nowise affect the evil against which it legislated, but, as respects a criminal enactment, there can be but one result where we cannot determine whether the legislative authority bids us to go with it a mile or to go with it twain. Indeed, it is never safe in the construction of a statute to give weight to views as to its policy, where such views are themselves open to doubt and controversy. Relative to considerations of policy and convenience, Judge Story is credited with the statement that "men, on such subjects complexionally differ from each other; the same men differ from themselves at different times." Potter's Dwarris, Statutes, 215; Sedgwick, Stat. and Const. Law (2d ed.), 308. While such considerations are not without force in some circumstances, especially where used to show that the letter of the law is an expression of its spirit, yet we can in nowise sanction the view that a court is at liberty, where doubt remains as to the intent of a penal enactment after testing it by the recognized canons of construction, to venture among warring opinions in the legislative domain in search of what it conceives to be public policy. Such a practice must not infrequently result in judicial legislation. "The idea that the judges in administering the written law, can mold it and warp it according to their notions, not of what the legislator said, not even of what he meant, but of what in their judgment he ought to have meant—in other words,

according to their own ideas of policy, wisdom, or expediency—is so obviously untenable that it is quite apparent that it never could have taken rise, except at a time when the division lines between the great powers of government were but feebly drawn, and their importance very imperfectly understood." Sedgwick, Stat. and Const. Law (2d ed.), 265.

The necessity of considering separately the various propositions on which we base our conclusion that the defendants were not shown to be guilty, apparently leaves each proposition to make its own impact on the construction contended for by the State, but it must not be forgotten that whatever of dynamics these propositions involve, they must be regarded as having a cumulative operation. When so considered, we do not perceive how it could be contended that the defendants were guilty. There still remains of the act, as we have construed it, all and more of prohibition relative to cigarettes than is found in the Tennessee statute, and we have not been able to find that it has ever been contended under the Iowa law that there was a liability under such facts as exist in the cases before us.

The appeal in State v. Lowry is not sustained. The judgment of conviction in Lewis v. State is reversed, with a direction to grant a new trial.

Montgomery, J., concurs in result in No. 20,719 but dissents in No. 20,646.

## DISSENTING OPINION.

MONTGOMERY, J.—The State may not, in the proper exercise of its police power, so far interfere with federal control of interstate commerce as to prohibit the importation of cigarettes in packages of customary sizes in such commerce. The right of importation carries with it the right to resell in original packages, and the right by the importer to own and keep such cigarettes for personal use.

*Donald* v. *Scott* (1895), 76 Fed. 554; *Scott* v. *Donald* (1897), 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632; *Bowman* v. *Chicago, etc., R. Co.* (1888), 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700. These principles induce me to concur in the result reached in the Lowry case.

In the Lewis case, however, I cannot give assent to the construction of the statute under consideration, adopted by the majority of the court. The prevailing opinion legalizes ownership and possession of cigarettes for personal use, without regard to the source from which they were obtained. This holding denounces as a criminal the man who sells or gives away a cigarette, but shields the one who procures the unlawful act to be done. It is difficult to conceive that a possession can be lawful which is wholly founded upon an unlawful transaction. Courts have nothing to say concerning the mere policy of legislation. It is for the legislature to determine what regulations are needed to protect the public health, morals and safety, and if the measures adopted are intended, convenient and appropriate to these ends, the exercise of its discretion is not subject to review by the courts. But when the legislature in the exercise of the police power of the State has passed an act, it is the duty of the court to give it the greatest effect reasonably possible towards accomplishing the objects intended. It is a familiar principle that where the meaning is doubtful, in seeking the intent of the legislature, it is proper for the court not only to consider the letter of the act, but also the circumstances under which it was enacted, prior legislation upon the same subject, the mischief to be remedied and other like matters. *State Board, etc.,* v. *Holliday* (1898), 150 Ind. 216, 233, 42 L. R. A. 826; *Hunt* v. *Lake Shore, etc., R. Co.* (1887), 112 Ind. 69, 75; *Middleton* v. *Greeson* (1886), 106 Ind. 18, and cases cited.

In 1893 (Acts 1893, p. 19) the legislature passed an act making it unlawful to give, barter or sell, either di-

rectly or indirectly, to any child under sixteen years of age, tobacco or preparations of tobacco to be chewed or smoked by said child, or to persuade, advise, counsel or compel any such child to chew or smoke tobacco.

In 1897 (Acts 1897, p. 205) it was made unlawful to sell, barter, furnish or give away, directly or indirectly, to any minor, any cigarette, cigarette wrapper or any substitute for either, or to procure for, or to persuade, advise, counsel or compel any minor to smoke any cigarette.

The General Assembly of 1905 (Acts 1905, pp. 16 and 584, 719, §§2213-2215 Burns 1905) in revising the criminal code reënacted these statutes, and in addition passed the act now under consideration. It is manifest that the last enactment is not the result of an emotional impulse, but is the product of mature thought and of gradual growth, and was intended to meet an existing necessity. Construing these statutes together, as we must, it is evident that the primary consideration of the legislature was to provide some effectual means of protecting the youth of the State from the pernicious effects of cigarette smoking. It is conceded by all that the use of cigarettes by the young is injurious to a serious degree, and it is a matter of common knowledge that prior laws had proved inadequate to prevent the evil. Keeping in mind the history of legislation upon this subject, the inefficiency of prior statutes, the existing evil, and the ends to be attained, what is the fair and reasonable interpretation of the language of the act? Is the possession of these contraband articles denied only to dealers and warehousemen having in view a sale or some species of disposition to others, or is such possession forbidden to all persons and for any purpose, except when within the protection of the interstate commerce clause of the Constitution of the United States?

The statute under consideration was manifestly patterned from §5006 Code of Iowa 1897, which reads as follows: "No one, by himself, clerk, servant, employe or

agent, shall, for himself or any person else, directly or indirectly, or upon any pretense, or by any device, manufacture, sell, exchange, barter, dispense, give in the consideration of the purchase of any property, of any services, or in evasion hereof, or keep for sale, any cigarettes or cigarette paper or cigarette wrappers, or any paper made or prepared for the purpose of making cigarettes, or for the purpose of being filled with tobacco for smoking; or own or keep, or be in any way concerned, engaged or employed in owning or keeping, any such cigarettes or cigarette paper or wrappers, *with intent to violate any provision of this section;* or authorize or permit the same to be done," etc.

The omission of the italicized words from the Iowa statute, requiring an unlawful intent to sell or dispose of the prohibited articles in connection with the owning and keeping of the same, is very significant. The language of the Indiana act is that it shall be unlawful for any person to keep or own any cigarette, cigarette paper or wrapper, without any qualification as to whether the same is for sale or use. The obvious meaning of the words "keep" and "own" as here used, it seems to me, is that no one shall "keep" or hold a mere naked possession for the use of another, and "own" or hold by virtue of his own title, these prohibited articles. A more limited and obscure meaning might be ascribed to these words, but this interpretation appears so patent as to make the learning of a philologist unnecessary. This construction makes the administration of this statutory police regulation easy and effectual, but if the application of the act is to be limited as held in the principal opinion, its fair enforcement becomes impossible, and the evil against which it was directed will be but slightly mitigated. We cannot expect satisfactory enforcement of a law which makes guilt or innocence depend upon the secret intent of the accused person.

The characteristics distinguishing dealers and consumers who own articles suitable for use as well as sale are too capricious for practical purposes. The construction adopted in the majority opinion will no doubt close established places of business and banish reputable dealers in this species of goods, but it may turn loose upon the community a horde of irresponsible peripatetic agents, carrying a stock ostensibly for their own use, seeking purchasers in privacy and preying upon the artificial appetite created by their acquired habits. I do not think the application of the law was intended to be so limited. This view is supported and confirmed by reference to the legislative journals containing the proceedings relating to the passage of this act. Such journals are not only proper, but often most valuable aids to the court in determining the legislative intention, where the language used is of doubtful meaning. *Edger* v. *Board, etc.* (1880), 70 Ind. 331; *Walter A. Wood, etc., Mach. Co.* v. *Caldwell* (1876), 54 Ind. 270, 23 Am. Rep. 641; 26 Am. and Eng. Ency. Law (2d ed.), 639.

It appears from the House Journal of 1905, p. 1221, that when the bill was pending upon second reading and was under consideration as a special order, among other amendments proposed was the following: "It shall be unlawful for any person under the age of twenty-one years to smoke, use, keep or own, or be in any way connected, engaged or employed in smoking, using, owning or keeping any cigarettes, cigarette paper or wrappers. Any person violating," etc. This proposed amendment was rejected by the friends of the bill. Immediately before taking the vote upon the final passage of the bill an amendment was proposed to section one, embodying in substance the conclusion of the majority in the following language: "Provided further, that nothing in this section shall prevent persons over twenty-one years of age from having in their possession to be used, cigarettes, cigarette paper and tobacco." This proposed amendment was rejected. House Journal

of 1905, p. 1398. It is my opinion that it was and is the intent of this statute, as finally passed, to make the possession of cigarettes, and the constituent parts thereof mentioned, by any person within this State, unlawful, except where such possession is within the protection of the interstate commerce clause of the Constitution of the United States.

A discussion of the constitutional question argued in this connection is unnecessary, and the judgment against appellant Lewis ought to be affirmed.