[Nos. 5905, 5917.]

STUBBS v. THE PEOPLE.

FITZELL v. THE PEOPLE.

1. Constitutional Law—Interstate Commerce—Police Power—Prohibiting Importation.

Whatever may be the nature and reach of the police power of the state, it cannot be exercised over a subject confided exclusively to congress by the federal constitution; and the power cannot be conceded to the state to exclude, directly or indirectly, the lawful subjects of interstate commerce, or by the imposition of burdens thereon, to regulate such commerce without congressional permission.—P. 426.

2. Same—Prohibiting the Use of Imported Articles.

When a state has no power to prohibit the importation of certain articles, it cannot prohibit their use by the importer, for otherwise the state would accomplish indirectly that which the federal constitution prohibits it from doing directly, a principle which is not countenanced by the law.—P. 429.

3. Same—Docked-Tailed Horses—Use by Others than Owner.

Section 1, c. 93, Sess. Laws 1899, provides that it shall be unlawful for any person to dock the tail of any horse within the state of Colorado, or to procure the same to be docked, or to import or bring into the state any docked horses; or to drive, work, use, race or deal in any unregistered docked horse within

the state.  Held, that so much of the statute as prohibits the
importing or bringing into the state of docked-tailed horses or
the using of them while they are still owned by the person who
imports them, is in violation of the federal constitution; and
that such horses may be lawfully used, either by the owner or
by any other person under his direction and control.—P. 436.

*Error to the District Court of the City and County
of Denver.*

*Hon. Samuel L. Carpenter, Judge.*

Charles E. Stubbs and Nehemiah H. Fitzell were
each convicted of driving and using imported docked-
tailed horses, and each brings error.        *Reversed.*

Decision *en banc.*

Mr. STERLING B. TONEY, Mr. HENRY V. JOHNSON,
and Mr. R. BURGE TONEY, for Charles E. Stubbs; and
Mr. O. N. HILTON and Mr. CAESAR A. ROBERTS, for
Nehemiah H. Fitzell.

Mr. WM. H. DICKSON, attorney general, Mr. S.
H. THOMPSON, assistant attorney general, and Mr.
I. B. MELVILLE, for defendants in error.

Mr. JUSTICE BAILEY delivered the opinion of the
court:

Inasmuch as the same principles are involved
in each of these cases, they will be considered to-
gether.

In the case against Stubbs it appears that in
July, 1905, William M. Springer, a partner of de-
fendant Stubbs, purchased in Wales a Welch cobb
pony which had a docked tail.  It was shipped to
the United States, landed at New York upon August
20th, 1905, and was shipped from there direct to
Denver, to be kept in the stables of Springer and
Stubbs.  Mr. Springer purchased and imported this
horse for the use of his daughter.  In the month of
December, 1905, the defendant Stubbs took his niece,

a little girl visiting in Denver, for a drive behind this pony, and was arrested and convicted for using a docked-tailed horse.

In the case against defendant Fitzell, it appears that The Daniels and Fishers Stores Company authorized Mr. Kuykendall to purchase for them a pair of horses which would be good enough to show in heavy draft exhibitions. Pursuant to that request Mr. Kuykendall purchased from Tishner of Chicago a pair of gray geldings which were shipped from Chicago to Denver and received by Mr. Kuykendall for The Daniels and Fishers Stores Company and for the first time it was learned by Mr. Kuykendall that these horses had docked tails. The horses were kept at the stables of The Denver Omnibus and Cab Company, of which Mr. Kuykendall appears to have been manager, and were driven by the defendant for the purpose of exercising them. They were brought here as show horses and exhibited at different places throughout the state.

In another case against this defendant it appears that a sorrel gelding was sent from the Rainsford ranch in Wyoming to Denver for the purpose of being broken and exhibited at the then coming horse show. This horse was driven by defendant Fitzell and he was arrested for that and was convicted in both cases for using docked-tailed horses.

The act of 1899, Session Laws of 1899, page 171, § 1, provides that: "It shall be unlawful for any person or persons to dock the tail of any horse within the state of Colorado, or to procure the same to be docked, or to import or bring into this state any docked horse or horses, or to drive, work, use, race or deal in any unregistered docked horse or horses within the state of Colorado."

These cases make it necessary to determine two questions. The first is: Has the state the power

to prohibit importing or bringing into the state horses with docked tails? The second is: If it has not such a power, has it the authority to prevent the use of such horses after they have been brought into the state, so long as they are the property of the person who imported them?

At the January, 1904, term of this court this law, so far as it prohibited the use of docked horses which were docked in the state of Colorado after the passage of the act, was declared valid.—*Bland v. People,* 32 Colo. 319.

The decision was based largely upon the theory that the use of docked horses was detrimental to the public morals, because frequently seeing the mutilated and disfigured animals tends to sear the conscience and minds of the people until they become accustomed to looking upon such things as a matter of course and consequently it would tend to promote cruelty. The validity of that part of the act which prohibits the importation of docked horses or the bringing of them in from other states for use in this state was not passed upon but was expressly excluded as not being involved in the case. At the next session of the legislature after this court had said that the sight of docked horses tended to sear public conscience and promote cruelty, the legislature repealed the law in so far as it relates to the importation and use in this state of docked, pure bred stallions and mares from foreign countries for breeding and exhibition purposes only and to docked-tailed native bred stallions and mares brought into this state and used for breeding and exhibition purposes only. This amendment destroys in a large degree the reasoning of the court in the *Bland case,* because the exhibition of a mare or stallion brought in from another state cannot be said to be less offensive to a sensitive mental or moral organization

than the exhibition of one which was bred and raised in Colorado, nor can it be said that the exhibition of a short-tailed stallion or a short-tailed mare brought into this state for breeding and exhibition purposes would tend to sear the public conscience or destroy public morality to a less degree than the exhibition of a gelding which has been brought into this state from a foreign country or another state. The exhibition of a docked-tailed horse before the multitude which is wont to gather at horse shows and other places where horses are publicly exhibited cannot be said to be less injurious to the public than the driving or using of them in the ordinary manner in which such animals are used: So that, no matter how correct the reasoning indulged in by the court in the *Bland case* of 1904 may have been, the theory upon which such reasoning was based has been destroyed by the legislature which met in 1905. If that reasoning is still good, can it be said that it affords a sufficient excuse for the prohibition of the importation into this state of docked-tailed horses? So far as we have been advised, no other state in the Union has attempted to do such a thing. Consequently, there are no authorities that are directly in point upon this proposition. However, the same principle has been repeatedly before the supreme court of the United States. In the case of *United States v. E. C. Knight Co.*, 156 U. S. page 1, it is said:

"It cannot be denied that the power of a state to protect the lives, health, and property of its citizens, and to preserve good order and the public morals, 'the power to govern men and things within the limits of its dominion,' is a power originally and always belonging to the states, not surrendered by them to the general government, nor directly restrained by the constitution of the United States, and essentially exclusive * * * On the other

hand, the power of congress to regulate commerce among the several states is also exclusive. The constitution does not provide that interstate commerce shall be free, but, by the grant of this exclusive power to regulate it, it was left free except as congress might impose restraints. Therefore, it has been determined that the failure of congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several states, and if a law passed by a state in the exercise of its acknowledged powers comes into conflict with that will, the congress and the state cannot occupy the position of equal opposing sovereignties, because the constitution declares its supremacy and that of the laws passed in pursuance thereof; and that which is not supreme must yield to that which is supreme. 'Commerce, undoubtedly, is traffic,' said Chief Justice Marshall, 'but it is something more, it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse.' That which belongs to commerce is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the state."—*Gibbons v. Ogden,* 9 Wheat. 1, 189, 210; *Brown v. Maryland,* 12 Wheat. 419, 448; *The License Cases,* 5 Howard 504, 599; *Mobile v. Kimball,* 102 U. S. 691; *Bowman v. Chicago, etc., Ry.,* 125 U. S. 465; *Leisy v. Hardin,* 135 U. S. 100; *In re Rahrer,* 140 U. S. 545, 555.

In *Bowman v. Chicago, etc., Ry. Co., supra,* in the concurring opinion of Justice Field, it is said:

"Whatever our individual views may be as to the deleterious or dangerous qualities of particular articles, we cannot hold that any article which con-

gress recognizes as subjects of interstate commerce are not such, or that whatever are thus recognized can be controlled by state laws amounting to regulations, while they retain that character; although at the same time, if directly dangerous in themselves, the state may take appropriate measures to guard against injury before it obtains complete jurisdiction over them. To concede to a state the power to exclude, directly or indirectly, articles so situated, without congressional permission, is to concede to a majority of the people of a state, represented in the state legislature, the power to regulate commercial intercourse between the states, by determining what shall be its subjects, when that power was distinctly granted to be exercised by the people of the United States, represented in congress, and its possession by the latter was considered essential to that more perfect union which the constitution was adopted to create."

*Scott v. Donald,* 165 U. S. 58, and *Gardner v. Donald,* reported at the same place, were actions brought by Donald against Scott and Gardner, wherein it was alleged that the defendants, acting as state constables of the state of South Carolina, had injured plaintiff in seizing and carrying away several packages of liquors brought into South Carolina from other states. They involved the constitutionality of the dispensary act of South Carolina. The act was declared to be unconstitutional as interfering with the interstate commerce powers of the general government. The court said that the state laws that have been most frequently considered and the occasion of the most discussion have been those which have sought to regulate or prohibit the importation, manufacture and sale of intoxicating liquors. "The evils attending the vice of intemperance in the use of spirituous liquors are so great that a natural

reluctance is felt in appearing to interfere, even on constitutional grounds, with any law whose avowed purpose is to restrict or prevent the mischief.''

The court concedes that the South Carolina law was passed in the *bona fide* exercise of the police power, and that the police power of the state was not simply used to interfere with the rights and privileges of citizens secured both by the constitution and laws of the United States. The court holds that so long as liquors and wines are recognized as commodities which may be lawfully made, bought and sold, that the statute attempting to regulate or prohibit their being brought into the state is an interference with commerce.

In *Bowman v. Chicago, etc., Ry. Co., supra,* in which the defendant refused to carry beer from Nebraska to Iowa because the statute of Iowa prohibited the bringing of it into the state, it is determined that the act of Iowa was unconstitutional. Of course it was attempted to justify the Iowa act as an exercise of the police power of the state. The supreme court, quoting from the *License cases,* 5 Howard 504, said:

''The assumption is, that the police power was not touched by the constitution, but left to the states, as the constitution found it. This is admitted; and whenever a thing, from character or condition, is of a description to be regulated by that power in the state, then the regulation may be made by the state and congress cannot interfere. But this must always depend on facts subject to legal ascertainment, so that the injured may have redress. And the fact must find its support in this, whether the prohibited article belongs to, and is subject to be regulated as part of, foreign commerce, or of commerce among the states. If, from its nature, it does not belong to commerce, or if its condition, from putrescence or

other causes, is such, when it is about to enter the state, that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction. And as an incident to this power, a state may use means to ascertain the fact. And here is the limit between the sovereign power of the state and the federal power. That is to say, that which does not belong to commerce is within the jurisdiction of the police power of the state; and that which does belong to commerce is within the jurisdiction of the United States.''

The court then alludes to the fact that the state court must have assumed that the state had power to declare what should be an article of lawful commerce in the particular state, and, having declared that ardent spirits were deleterious to commerce and health, they ceased to be commercial commodities there. The police power then attached and consequently the powers of congress could not interfere. Just as in the case at bar, the legislature had determined that docked-tailed horses may not be brought into this state and used, except for breeding and exhibition purposes, because the sight of them is detrimental to the public morals. There can be no two opinions as to whether the sale of intoxicating liquors is more detrimental to the public morals or the public health or public safety, or to anything else which is subject to the control of the state under the exercise of its police power, than is the sight of a short-tailed horse being used in the ordinary manner. The court then, alluding to the power of the state to determine as to what is an article of lawful commerce, proceeds to say:

''If this be the true construction of the constitutional provision, then the paramount power of congress to regulate commerce is subject to a very ma-

terial limitation; for it takes from congress, and leaves with the states, the power to determine the commodities, or articles of property, which are the subjects of lawful commerce. Congress may regulate, but the states determine what shall or shall not be regulated. Upon this theory the power to regulate commerce, instead of being paramount over the subject, would become subordinate to the state police power; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is, in effect, the controlling one. The police power would not only be a formidable rival, but, in a struggle, must necessarily triumph over the commercial power, as the power to regulate is dependent upon the power to fix and determine upon the subjects to be regulated. The same process of legislation and reasoning adopted by the state and its courts could bring within the police power any article of consumption that a state might wish to exclude, whether it belonged to that which was drunk, or to food and clothing, and with nearly equal claims to propriety; as malt liquor and the produce of fruits other than grapes stand on no higher ground than the light wines of this and other countries, excluded, in effect, by the law as it now stands. And it would be only another step to regulate real or supposed extravagance in food and clothing."

*Leisy v. Hardin, supra,* is a case in which it was determined that the statute of Iowa which prohibited the sale of intoxicating liquors, except for certain purposes, as applied to a sale by the importer of such liquors manufactured in and brought from another state in the original package unbroken and unopened, is unconstitutional and void as repugnant to the clause of the constitution granting to congress the power to regulate commerce with foreign nations

and among the states. Chief Justice Fuller wrote the opinion, and, among other things, he says:

"The power vested in congress 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes,' is the power to prescribe the rule by which that commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those with the subject on which it acts and cannot be stopped at the external boundary of a state, but must enter its interior and must be capable of authorizing the disposition of those articles which it introduces, so that they may become mingled with the common mass of property within the territory entered. * * *

"And while * * * a state may provide for the security of the lives, limbs, health and comfort of persons and the protection of property so situated, yet a subject-matter which has been confided exclusively to congress by the constitution is not within the jurisdiction of the police power of the state unless placed there by congressional action."

*Railroad Company v. Husen*, 95 U. S. 465, which was an action brought under the Missouri statute of 1872, provides that: "No Texas, Mexican or Indian cattle shall be driven or otherwise conveyed into, or remain in any county in this state, between the first day of March and the first day of November in each year." This statute was held to be unconstitutional as interfering with the interstate commerce. The court said:

"Whatever may be the power of a state over commerce that is completely internal, it can no more prohibit or regulate that which is interstate than it can that which is with foreign nations. Power over one is given by the constitution of the United States to congress in the same words in which it is given

over the other, and in both cases it is necessarily exclusive.''

In *County of Mobile v. Kimball, supra,* it is said:

''The subjects   *   *   *   upon which congress can act under this power are of infinite variety, requiring for their successful management different plans or modes of treatment. Some of them are national in their character, and admit and require uniformity . of regulation, affecting alike all the states; others are local, or are mere aids ,to commerce, and can only be properly regulated by provisions adapted to their special circumstances , and localities. Of the former class may be mentioned all that portion of commerce with foreign countries or between the states which consists in the transportation, purchase, sale and exchange of commodities. Here there can of necessity be only one system or plan of regulations, and that congress alone can prescribe. Its non-action in such cases with respect to any particular commodity or mode of transportation is a declaration of its purpose that the commerce in that commodity or by that means of transportation shall be free. There would otherwise be no security against conflicting regulations of different states, each discriminating in favor of its own products and citizens, and against the products and citizens of other states. And it is a matter of public history that the object of vesting in congress the power to regulate commerce with foreign nations and among the states was to insure uniformity of regulation against conflicting and discriminating state legislation.''

So, applying the reasoning adopted in that case to the matter of the use of animals; it might well be said that if Colorado can exercise the right to prohibit the importation and use in this state of docked-tailed horses because it is a valid exercise of the

police power in that the gazing upon such animals tends to destroy public morality because it breeds a familiarity with cruelty, then the legislatures of New Hampshire and other New England States could with equal propriety prohibit the importation into such states and the use therein of horses which have been branded, because the sight of the unseemly scars and disfigurations occasioned by such brands tends to sear the conscience of the beholder as the hide of the animal was seared, and inures the conscience of the citizen against the shock which evidences of such cruelty would naturally produce. The thought of the roping, throwing, mauling around and branding of a branded horse cannot be less offensive to one of a sensitive mind or less apt to sear the conscience of a moral public than the sight of a horse which has had a few joints of its tail amputated. The same might be said of the dehorning of cattle. If we can prohibit the bringing into this state of a horse which is partially tailless, why cannot Illinois prohibit the bringing into that state of cattle which are totally hornless? Probably the horse which has had a portion of its tail amputated has suffered to no greater degree than the steer which has had his horns separated from his head, or an animal which has suffered from the burning of the brands of a dozen different owners.

These authorities are sufficient, and more than sufficient, to demonstrate that whatever may be the nature and reach of the police power of the state, it cannot be exercised over a subject confided exclusively to congress by the federal constitution. It cannot invade the domain of the national government. The power cannot be conceded to a state to exclude directly or indirectly the lawful subjects of interstate commerce, or, by the imposition of burdens thereon, to regulate such commerce without con-

gressional permission. The same rule that applies to the sugar of Louisiana, the cotton of South Carolina, the wines of California, the hops of Washington, the tobacco of Maryland or Connecticut, the whiskey of Kentucky and the beer of Milwaukee must apply with equal force to the docked-tailed horses of Wyoming, Illinois, Massachusetts or New York and those which are imported from foreign countries. It applies to all commodities in which a right of traffic exists and is recognized by the laws of congress. It devolves upon congress to indicate such exceptions as in its judgment a wise discretion may demand under particular circumstances. If it may be considered that those authorities are not sufficient to support this doctrine, the following may be considered: *Walling v. Michigan,* 116 U. S. 446; *License Cases,* 5 Howard 504; *Head Money Cases,* 112 U. S. 580; *Austin v. Tenn.,* 179 U. S. 343; *Mugler v. Kans.,* 123 U. S. 623; *Railroad v. Husen,* 95 U. S. 465; *Schollenberger v. Penn.,* 171 U. S. 1; *Collins v. N. H.,* 171 U. S. 330; *McGregor v. Cone,* 104 Iowa 465.

This brings us to the second proposition involved in this case, namely, it having been demonstrated that the state has not the power to exclude the importation or the bringing into this state from other states of docked-tailed horses, has it the power to prohibit the use of such horses while they still remain the property of the importer?

The first great case upon this subject and the one that has been followed by the highest courts of the land since its decision is *Brown v. Maryland,* 12 Wheat. 419. The opinion was written by Chief Justice Marshall, and the following are quotations therefrom which are deemed pertinent to the determination of this question:

"There is no difference, in effect, between a power to prohibit the sale of an article, and a power to prohibit its introduction into the country. The one would be a necessary consequence of the other. No goods would be imported if none could be sold."

And by the same reasoning there is no difference between the power to prohibit the use of a horse and a power to prohibit its introduction into the country. The one is the necessary consequence of the other. No horses will be imported if they cannot be used. So that when it was sought to punish defendant for using the horse in question, it simply amounted to a prohibition of the bringing of him into the state.

"When the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution."

"The counsel for plaintiffs in error contend, that the importer purchases, by payment of the duty to the United States, a right to dispose of his merchandise, as well as to bring it into the country; and certainly the argument is supported by strong reason, as well as by the practice of nations, including our own. The object of importation is sale; it constitutes the motive for paying the duties; and if the United States possess the power of conferring the right to sell, as the consideration for which the duty is paid, every principle of fair dealing requires that they should be understood to confer it. The practice of the most commercial nations conforms to this idea. Duties, according to that practice, are charged on

those articles only which are intended for sale or consumption in the country.''

While the argument of the court relates simply to the sale of the property, it may with equal force be applied to the use of the property, because some property is brought into the state for sale by the importer, and other, as in this particular case, for the personal use of the importer. If the state can prevent the importer from using the property which he brought into the state for his own personal use, then it is idle to say that it cannot prevent its being brought in. The state would have accomplished indirectly that which it is prohibited by the constitution from doing directly, a principle which is not countenanced by the law.

*Vance v. Vandercook Co.,* 170 U. S. 438, is another whiskey case coming from South Carolina and based upon the South Carolina statute which prohibited the introduction of liquors into that state except through certain state officials, in which it was said:

''Under the constitution of the United States every resident of South Carolina is free to receive for his own use liquor from other states, and that the inhibitions of the statute do not operate to prevent liquors from other states from being shipped into such state, on the order of a resident for his own use.'' And again: ''But the right of persons in one state to ship liquor into another state to a resident for his own use is derived from the constitution of the United States, and does not rest on the grant of the state law.''

Justice Field, in a concurring opinion in the case of *Bowman v. Chicago, etc., Ry. Co., supra,* says:

''The state possesses the power to prescribe all such regulations with respect to the possession, use and sale of property within its limits as may be

necessary to protect the health, lives and morals of its people; and that power may be applied to all kinds of property, even that which in its nature is harmless. But the power of regulation for that purpose is one thing, and the power to exclude an article from commerce by a declaration that it. shall not thenceforth be the subject of use and sale is another and very different thing. If the state could thus take an article from commerce, its power over interstate commerce would be superior to that of congress where the constitution has vested it.''

In the *License Cases,* 5 Howard 589, Justice McLean says:

''These laws do not in terms prohibit the sale of foreign spirits, but they require a license to sell any quantity less than twenty-eight gallons. Under the decision of *Brown v. Maryland,* it is admitted that the license acts cannot operate upon the right of the importer to sell. But, after the import shall have passed out of the hands of the importer, whether it remain in the original package or cask, or be broken up, it becomes commingled with other property in the state and is subject to its laws.''

Mr. Justice Catron said:

''While foreign liquors imported according to the regulations of congress, remain in the cask, bottle, etc., in the original form, then the importer may sell them in that form at the port of entry, or in any other part of the United States; nor can any state law hinder the importer from doing so; nor does it make any difference whether the imported article paid a tax on its introduction, or was admitted as a free article; until it passes from the hands of the importer, it is 'an import' and belongs to 'regulated foreign commerce,' and is protected.''

These horses at the time of the arrest were still the property of the importers. Under Judge Cat-

ron's view the importers would have the right to sell them and, as we think, if they did not import them for sale, but imported for their own personal use, they would have the right to use them and, consequently, could not be liable under the statute for so doing.

In Indiana there is a statute making it a misdemeanor for any person to keep or own cigarettes. Lowry had shipped to him for his personal use, by a dealer in Louisville, Ky., one thousand cigarettes. Some of these cigarettes were found upon the person of Lowry and he was arrested and convicted. The matter went to the supreme court of Indiana and was determined April 6th, 1906, *State of Ind. v. Lowry*, 77 N. E. 728. In reversing the judgment of conviction, among other things, the court said, after reviewing the cases of *Donald v. Scott*, 76 Fed. 554; *Scott v. Donald*, 165 U. S. 58; *Vance v. Vandercook*, 170 U. S. 438; *Pabst Brewing Co. v. Crenshaw*, 198 U. S. 17, and other federal cases:

"If the above cases mean anything and principle is to control, it must be held that it is incompetent for a state to deny to a proper person the right to hold in an original package an article like tobacco which he has shipped into the state. After he has borne the burden of importation, and has enjoyed the protection of the federal law from the initial negotiation until the package is at rest, it cannot be that the state can treat a possession thus acquired as contraband. So long as a right to import for personal consumption is recognized, we affirm with all confidence that the right to hold the package is protected."

*Donald v. Scott*, 76 Fed. 554, cited by defendant in error, is a whiskey case. Section 21 of the South Carolina dispensary law made it a crime for any one to keep a club or other place where liquors were re-

ceived or kept for use, barter or sale as a beverage. The petitioner bought and imported into South Carolina a package of whiskey for his own personal use and kept it at the Columbia club. While he was making a cherry bounce, the respondents seized and carried it away. The court said:

"The right to import under the interstate commerce law would be idle if the subject-matter imported were not protected when it reaches its destination as it is protected in its importation solely because it is imported for personal use."

It would be protected so long as this personal use continued.

Thus it is seen that the state cannot prohibit the sale by the importer of whiskey brought from another state while it remains in the same package in which it was delivered to the importer; neither can the state prohibit the using by the importer of intoxicating liquors which he brought from another state; nor can the state interfere with a man's right to keep cigarettes which he has brought from another state. If this be true, how can the state prohibit the use by the importer of an animal which was lawfully brought from another state? If the horse remains in the same condition in which he was imported and is not afflicted with any contagious disease, there is no reason why his use in the state could not be determined by the same rules under which it was decided that the importer of whiskey could sell or use it and that the importer of cigarettes could hold them; unless it be determined that the sight of a docked-tailed horse is more offensive to a refined people than the sight of a person under the influence of intoxicating liquor. We are unwilling to say that the use of whiskey or cigarettes is less detrimental to the public health or the public morals or the public safety than is the driving or using of a short-tailed horse. If

the police power of the state does not warrant the state in preventing the sale or use of whiskey by the importer, it will not warrant the state in preventing the use of the horse by the importer. The state says, admitting all of this to be true (that is, that the horse may be lawfully brought into the state and that it may be used by the importer), that this does not excuse the defendants in these cases because they were not the importers but were mere volunteers; and that, being volunteers, they cannot raise the constitutional question involved, and cite as authorities for that proposition the case of *Airey v. People,* 21 Colo. 144; *Newman v. People,* 23 Colo. 300, and other cases.

As to the proposition that no person can attack the constitutionality of a statute whose rights are not affected, there can be no question but that this is a sound legal statement. The difficulty with it is its application to these particular cases. The horses in question belonged to the parties who brought them into the state. If they had the legal right to use them, there is no good reason why the horses might not be used by the servants, agents, partners or the members of the family of the importers. It will not do to say that it is lawful for the importer to use the horse himself, but that it may not be used by any other person. If we should say that, the result would be that the docked-tailed horse which was brought into this state by Mr. Springer could be lawfully used by him, while the team brought in by The Daniels and Fishers Stores Company, if that is a corporation, could not be used at all, for the reason that it is impossible for a corporation to drive the team; it can only act through others. If the horse is protected while the owner holds the lines and drives it himself, it is none the less under the protection of the constitution if it is being driven by

the importer's coachman, or his wife, or his partner or the trainer. The legal character of the horse is not changed simply because it was driven by some one other than the owner himself. The state relies upon the second case of *Donald v. Scott,* found in 76 Federal Reporter 559. It appears that Mr. Gonzales imported two packages of whiskey, one for his own use and one of which he gave away. The court said that when he gave the one away it was no longer protected; that the protection of the interstate commerce law was a personal privilege and could not be transferred. This cannot mean that where articles like horses are protected, the mere temporary use of them by another would be a violation of the statute. In the *Scott case* the petitioner Gonzales had absolutely parted with his title to the property, and of course it would then become commingled with the property of the state.

It is further contended by the people that the clause of the statute prohibiting the use of unregistered docked horses is of the same character as the statutes of many of the states prohibiting having possession of game during the closed season. The principle involved in holding the game statutes constitutional is entirely different from the one involved in these cases. The case of *Magner v. People,* 97 Ill. 320, cited by the people, gives perhaps as clear a statement of the law relating to game as may be found in any of the cases. It is there said:

"The ownership (of game) being in the people of the state * * * the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results, that the legislature, as the representative of the people of the state, may withhold or grant to individuals the right to hunt and kill game, or qualify and re-

strict it, as, in the opinion of its members, will best
subserve the public welfare.

"Stated in other language, to hunt and kill
game, is a boon or privilege granted, either ex-
pressly or impliedly, by the sovereign authority—
not a right inhering in each individual; and, conse-
quently, nothing is taken away from the individual
when he is denied the privilege, at stated seasons,
of hunting and killing game     *     *     *

"And it would seem to be a legal truism, if a
state may constitutionally prohibit the killing and
possession of game during certain seasons, the pro-
hibition of the transportation of game killed and
possessed in violation of such prohibition cannot
be unconstitutional.   There cannot be a constitu-
tional right to transport property which cannot
legally be brought into existence     *     *     *

"The birds which are here admitted to have
been brought from Kansas, as appears by the laws
admitted in evidence by the agreement of the parties,
were there killed and possessed in violation of a law
of that state, and hence never legitimately became
an article of commerce."

The case of *State v. Saunders,* 19 Kan. 127, is
not in point because: "There, the prairie chickens
were lawfully killed, and lawfully became an article
of commerce, and their transportation was pro-
hibited.   Here, the quail were unlawfully taken and
killed, and their possession and sale in this state
were unlawful, but had they been lawfully taken and
killed, their transportation to a place where they
might be lawfully sold would not be interfered with
by the statute."

In the case at bar the horses were lawfully
docked in the state where it was permitted.   They
were articles of commerce; they were the property
of the owners instead of being the property of the

state, and it would seem that the state has not the power or authority to destroy that property. The prevention of its use amounts to a destruction of the thing itself.

In view of the foregoing, we necessarily conclude that so much of the statute as prohibits the importing or bringing into this state of docked-tailed horses, or the using of them while they are still owned by the person who brought them into the state, is in violation of the federal constitution, and that such horses may be lawfully used, either by the owner or any person else under his direction and control. Consequently, the defendants were unjustly convicted and the judgments will be reversed.

Decision *en banc.*                              *Reversed.*

---

CHIEF JUSTICE STEELE concurring specially:

I am of opinion that it is within the police power of the states to prohibit the importation and use of mutilated animals—mutilated not because of a tender solicitude for the welfare of the animals, nor for the benefit of society, but cruelly mutilated, from sordid motives, to supply the demands of the devotees of an ephemeral and senseless fashion. I cannot, therefore, agree with that portion of the opinion which maintains a contrary position.

But, try as I will, I can find no satisfactory answer to the argument that the legislature, by authorizing the importation of docked horses for *exhibition* and for other purposes, repealed the prior law on the subject and destroyed the force and effect of the decision in the case *Bland v. The People* upon that branch of the case.

I therefore concur in the judgments discharging the defendants.